```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
       Criminal Action Nos. 17-CR-00334-CMA
 3                                          14-CR-00144-CMA-4
       UNITED STATES OF AMERICA,
 4
            Plaintiff,
 5
       vs.
 6
       MARCO CASTRO-CRUZ,
 7
            Defendant.
 8     _____
 9                        REPORTER'S TRANSCRIPT
                               Sentencing
10     _____

11          Proceedings before the HONORABLE CHRISTINE M.

12     ARGUELLO, Judge, United States District Court for the District

13     of Colorado, commencing at 9:05 a.m., on the 5th day of

14     February, 2017, in Courtroom A602, United States Courthouse,

15     Denver, Colorado.

16                             APPEARANCES

17          Bradley Giles and Barbara Skalla, U.S. Attorney's

18     Office, 1801 California Street, Suite 1600, Denver, CO 80202,

19     appearing for the plaintiff.

20          Boston H. Stanton, Jr., Attorney at Law,

21     P.O. Box 200507, Denver, CO 80220;

22          Sean Barrett, 214 West Lincolnway, Cheyenne, WY 82001,

23     appearing for the defendant.

24      Proceeding Recorded by Mechanical Stenography, Transcription
         Produced via Computer by Janet M. Coppock, 901 19th Street,
25          Room A257, Denver, Colorado, 80294, (303) 335-2106
```

1                        PROCEEDINGS

2              *THE COURT:*  Court calls Criminal Case No.

3    14-CR-00144-CMA-4 encaptioned United States of America versus

4    Marco Castro-Cruz.  The Court also calls Criminal Case

5    17-CR-334-CMA encaptioned United States of America versus Marco

6    Castro-Cruz.

7              Counsel, would you please enter your appearances.

8              *MR. GILES:*  Good morning, Your Honor.  Brad Giles

9    appearing on behalf of the United States, and also joined by

10   Ms. Skalla and by Nick Werth, who is a case agent on this

11   matter.  I mentioned to the Court's clerk Guy Till had a

12   medical emergency on Thursday and we expect he will be joining

13   us shortly.

14             *THE COURT:*  Okay.

15             *MR. STANTON:*  Good morning, Your Honor.  Boston

16   Stanton appearing on behalf of Mr. Castro-Cruz, along with my

17   associate counsel from Wyoming, Sean Barrett.

18             *MR. BARRETT:*  Good morning, Your Honor.

19             *THE COURT:*  Good morning.  Would the Court

20   interpreters please enter their appearances.

21             *THE INTERPRETER:*  Good morning, Your Honor.  Suzanna

22   Cahill and Cathy Bahr for the record.

23             *THE COURT:*  Anyone have an objection to Ms. Cahill and

24   Ms. Bahr serving as interpreters here today?

25             *MR. GILES:*  No, Your Honor.

1          *MR. STANTON:*  No, Your Honor.

2          *THE COURT:*  Ms. West, would you please administer the

3     oath to Ms. Bahr and Ms. Cahill.

4          (Interpreters were sworn:)

5          *INTERPRETER CAHILL:*  I do.

6          *INTERPRETER BAHR:*  I do.

7          *THE COURT:*  For the record, the Court also notes that

8     Officer Michelle Means representing the United States Probation

9     Office is also in attendance at this hearing.

10         Good morning.

11         *PROBATION OFFICER:*  Good morning, Your Honor.

12         *THE COURT:*  Mr. Stanton, would you and Mr. Castro-Cruz

13    please approach the podium.

14         *MR. STANTON:*  Yes, Your Honor.

15         *THE COURT:*  The record shows that on September 20th,

16    2017, pursuant to a Rule 11(c)(1)(C) Plea Agreement,

17    Mr. Castro-Cruz entered pleas of guilty to and was convicted of

18    the following counts:  In Criminal Case No. 14-CR-144, Count 1

19    of the Fourth Superseding Indictment charging a violation of

20    21, United States Code, Section 846 and 841(a)(1) and

21    (b)(1)(A), conspiracy to distribute 1 kilogram or more of

22    heroin and 500 grams or more of cocaine.

23         He also pled guilty to Count 1 of an Information

24    charging a violation of 18, United States Code, Section 1956,

25    money laundering.

1          In Criminal Case No. 17-CR-334, he pled guilty to one

2    count of conspiracy to distribute and possess with the intent

3    to distribute a quantity and mixture -- I am sorry, a quantity

4    of a mixture and substance containing a detectable amount of

5    heroin resulting in death, in violation of 21, United States

6    Code, Sections 846 and 841(a)(1) and (b)(1)(C).

7          We are here today for sentencing in both cases.  I

8    have received and reviewed the full Presentence Investigation

9    Reports in both cases.  In 14-CR-144, that was Docket No. 2015.

10   And in Case No. 17-CR-334, that was Document No. 11.  I have

11   reviewed all addenda thereto as well.

12         In 14-CR-144, I have also reviewed Document No. 1991

13   the defendant's objections to Presentence Report; Document

14   No. 2037, the defendant's sentencing memorandum and motion; and

15   Document No. 2090, which was a supplement to that motion.  I've

16   reviewed document No. 2007, the government's response to the

17   defendant's objections.

18         I did not see any motion to dismiss counts as to this

19   defendant.  And I reviewed -- I did not see any response to

20   Document No. 2037, which is the motion for a non-guideline

21   sentence.

22         In 17-CR-334, I have also reviewed Document No. 9, the

23   defendant's objections to the Presentence Report; No. 14, the

24   defendant's sentencing memorandum.  And there was a supplement

25   in that as well.  No, I take it back.  There was no supplement

 1    there because it only applied to 14-144.  Document 10, the

 2    government's response to defendant's objections.  And then

 3    there was a motion to dismiss Count 2 in that case filed on the

 4    2nd, Document No. 17.

 5              Are there any documents that I failed to identify that

 6    I should have reviewed in preparation for this hearing?

 7              *MR. GILES:*  Not on behalf of the United States, Your

 8    Honor.

 9              *MR. STANTON:*  None that the Court has currently.

10    However, Mr. Castro-Cruz did, in fact, present counsel and the

11    prosecution with his own pro se motion that he would like the

12    Court to entertain.  May I tender it to the Court?

13              *THE COURT:*  I will not entertain a pro se motion by a

14    represented party.

15              *MR. STANTON:*  Well, it's to discharge counsel and to

16    withdraw his plea.

17              *THE COURT:*  I will deny it.

18              *MR. STANTON:*  I understand, Your Honor.  It's his

19    wish.

20              *THE COURT:*  Let me see the motion.

21              *MR. STANTON:*  Thank you, Your Honor.

22              May I approach?

23              *THE COURT:*  You were not aware of this until this

24    morning, Mr. Stanton?

25              *MR. STANTON:*  No, Your Honor.

1      *THE COURT:*  The Court will indicate that it should be

2   docketed, but the Court strikes it as an inappropriate filing,

3   pro se filing by a represented party.

4      *MR. STANTON:*  I should note that on Friday, though, I

5   received a phone call from an inmate named Ken Oatman or

6   something saying that he was trying to give me a heads-up that

7   this may be coming.  However, we had met, I had met, as well as

8   my associated counsel had met with Mr. Castro-Cruz last week,

9   went over the Plea Agreement -- excuse me, the Presentence

10  Report.  And it was our understanding that we were proceeding

11  to sentencing this morning.

12     *THE COURT:*  All right.  And we are proceeding with

13  sentencing.

14     Mr. Stanton, have you had enough time to review the

15  Presentence Investigation Report with Mr. Castro?

16     *MR. STANTON:*  Yes, Your Honor.

17     *THE COURT:*  Did you explain the contents of the report

18  to him?

19     *MR. STANTON:*  Yes, Your Honor, with the assistance of

20  an interpreter.

21     *THE COURT:*  Do you have any concerns about his ability

22  to understand the contents of both reports?

23     *MR. STANTON:*  No.  And I actually left him a copy of

24  the Presentence Report as well.

25     *THE COURT:*  Mr. Castro-Cruz, did you get a copy of the

1  Presentence Report?

2        THE DEFENDANT:  Yes.

3        THE COURT:  Did you go over those reports with

4  Mr. Stanton and a Spanish interpreter?

5        THE DEFENDANT:  Yes, but it was just four days prior

6  that he came to review them with me.

7        THE COURT:  Mr. Stanton, when did you review the

8  Presentence Reports with Mr. Castro-Cruz?

9        MR. STANTON:  We reviewed the final Presentence Report

10  last week.  We reviewed the original, the first Presentence

11  Report, a week after we received it.  And you may inquire.  It

12  didn't change.  What did change was the guidelines went up from

13  324 to 360 to life is the only substantive change besides the

14  corrections I pointed out to the Probation Department.

15        THE COURT:  Mr. Castro-Cruz, did Mr. Stanton explain

16  the Presentence Report to you both times that he met with you?

17        THE DEFENDANT:  Yes.

18        THE COURT:  All right.  Mr. Stanton, you submitted

19  Document No. 1991 and 10 objecting to the Presentence Reports

20  in each case.  Now, I will tell you, just so that we can try to

21  narrow the scope of this hearing down, you all already received

22  my ruling on whether the Arizona conviction would count for

23  purposes of an 851 enhancement and I ruled that it did not.

24        The Court is inclined to accept the 11(c)(1)(C) Plea

25  Agreement which provides for a significant departure from the

1    advisory guideline range.  So to the extent that you dispute

2    facts and you dispute enhancements that are impacted, they are

3    not going to influence essentially the sentence the Court

4    imposes because if I adopt the 11(c)(1)(C), I am going to give

5    a substantial variance anyway.

6        Now, I understand that I am obligated to calculate the

7    appropriate advisory guideline range under the United States

8    Sentencing Guidelines, so I have taken very seriously and I

9    will address all of the objections that have been made by the

10   defendant in this hearing.  And I can assure you that I have

11   spent hours and hours, days, preparing for this sentencing

12   hearing because I understand that Mr. Castro-Cruz is looking at

13   a lot of time in prison as a result of being involved in this

14   drug trafficking organization.

15       That being said, it appears to me that most of the

16   disagreements between the defendant and the government do

17   appear to me to be academic exercises, and time consuming ones

18   at that, because regardless of what the ultimate advisory

19   guideline range turns out to be, neither the defendant nor the

20   government dispute that Mr. Castro-Cruz is subject to a

21   mandatory minimum sentence of 120 months in 14-CR-144 and a

22   mandatory minimum sentence of 240 months in 17-CR-334.

23       So while the Court could impose a sentence below 240

24   months in 14-CR-144, it cannot impose a sentence lower than 240

25   months in 17-CR-334.  And as I mentioned, the 11(c)(1)(C) Plea

1   Agreement asks this Court to vary down substantially from the

2   advisory guideline range to a range no higher than 276 months.

3           So with that being said, we will move on to the

4   objections.

5           MR. STANTON:  Thank you, Your Honor.

6           THE COURT:  Objection No. 1, the defendant objects to

7   Paragraph 16, 31 and 60 arguing that there are factual

8   inaccuracies in those not supported by the evidence and which,

9   if believed by the Court, might result in a harsher and

10  unjustified sentence.

11          The probation officer responds that this was

12  information contained in the paragraphs from the stipulated

13  facts of the Plea Agreement, a review of the discovery

14  materials and several conversations with the government and the

15  case agent.

16          Now, as background, I have had at least two days of

17  hearing for the *James* hearing.  I have had numerous briefing of

18  the issues, so the findings that I will make today are based on

19  my review.  I went back and reviewed in detail the script, the

20  transcripts of the *James* hearing.  I went back and reviewed the

21  briefing of all the parties with respect to the issues that

22  have arisen in this case.

23          So the facts I will make will be based on that review,

24  not what is contained in those paragraphs.  And then I will

25  hear argument from you all as well.

1          With respect to objection No. 2, the defendant objects

2     to the recommendation to the extent that it is inconsistent

3     with the 11(c)(1)(C) Plea Agreement.  The probation officer has

4     a job to do.  Its job is not to agree with the 11(c)(1)(C).

5     It's not bound by any agreement.  I didn't view that as really

6     an objection.  It's really more argument that, Mr. Stanton, you

7     can make to me.  And as I have already indicated after

8     reviewing this all, even though it would be a substantial

9     departure, I am inclined to go ahead and accept the

10    11(c)(1)(C).

11         The next objection is to Paragraph 75, the base

12    offense level of 34.  Defendant argues that he is responsible

13    for only 9.507 kilograms of heroin and 1.65 kilograms of

14    cocaine.  He argues those drugs amounts are equivalent to

15    9.837.4 kilograms of marijuana, according to the Sentencing

16    Guidelines, and that results in a base offense level of only 32

17    under United States Sentencing Guideline 2D1.1(c)(4).

18         The government disagrees with the defendant's chart

19    because it does not include approximately $80,000 in cash

20    recovered at Apartment 3B at Zuni on October 14, 2014; $53,670

21    in cash recovered from 9151 Cypress Drive on May 7, 2014;

22    $55,000 in cash from the gas tank of a 2005 Nissan Sentra sedan

23    stopped in Grand Junction in connection with this conspiracy on

24    May 5th, 2014; $9,181 in cash, which was on the person of

25    Mr. Marco Castro-Cruz when he was arrested on August 23rd,

2013; and April 28th, 2014 seizure of approximately 6 pounds of heroin and 1 pound of cocaine from a courier, Juan Martinez, who was on his way from Phoenix to Denver with these drugs in conjunction with this conspiracy when he was arrested in Arizona.

Thus, the government argues that the defendant overlooks about $197,000 in cash recovered under circumstances showing that it was derived from the sale of narcotics as part of this conspiracy. That approximates 28 ounces of cocaine and 168 ounces of heroin, which then takes us up to an offense level of 34.

The Court noted that the Plea Agreement provides that, "Defendant was actively involved in the organization's drug distribution activities in Denver, Colorado, from at least April 2013 until August 23rd, 2013 and from September or October 2014 through on or about October 14, 2014, when he and others were arrested at 5380 Zuni Street, Apartment 3B."

Even though Mr. Castro-Cruz may have been in Mexico from about September 26, 2013 until September or October of 2014, the government contends that the defendant was aware of and is responsible for the drug trafficking organization's drug distribution activities in Arizona and Colorado during his absence.

Based on the evidence presented in the government's amended *James* proffer, the exhibits attached thereto and the

1    testimony elicited at the *James* hearing itself, at that time

2    this Court found that the government had demonstrated by a

3    preponderance of the evidence that Defendant Castro-Cruz was a

4    knowing member of the drug distribution conspiracy alleged in

5    the Fourth Superseding Indictment.

6          The Court previously has found that the government has

7    demonstrated that Defendants Marco Castro-Cruz, Paul

8    Rubio-Sepulveda and Aaron Flores-Villegas were also knowing

9    members of the money laundering conspiracy.

10         Although Defendant Castro-Cruz was deported on

11   September 13, he later returned -- 2013, he later returned to

12   Colorado and continued his involvement in this drug trafficking

13   organization as if he had never departed.

14         Some of the exhibits that were submitted, the

15   wiretaps, demonstrate his involvement in organizing and

16   supplying drugs between May and July of 2013, wiretaps

17   indicating his involvement in various drug sales in October of

18   2014.  Those conversations on those wiretaps also involved him

19   warning various dealers about cops being nearby.

20         Sgt. James testified that he observed a vehicle

21   tracking device, camera surveillance and wiretaps; that

22   Mr. Castro-Cruz operated as a coordinator or dispatcher for the

23   organization between May and August 2013 and as a runner in

24   October of 2014.

25         Mr. Castro-Cruz was arrested at the Zuni stash house

1  on October 14, 2014.  And Sgt. James testified that he had been

2  frequenting that residence for two to three months.  Detective

3  Werth also testified that he found a false ID and documents

4  with Mr. Castro-Cruz's prints on it and a gun with his DNA on

5  it at the Cypress Street home when it was searched on May 7,

6  2014.

7          Detective Nick worth testified that Emma

8  Raudales-Bustamante was debriefed and indicated that she

9  purchased half ounces up to 2 ounces of cocaine and heroin at

10  $350 per half ounce every couple of days from Mr. Castro-Cruz.

11  He was the runner she identified who delivered the cocaine and

12  heroin to her.  Mr. Yonger Matute-Venegas has indicated that

13  Juan Miguel Espinoza-Romero and Marco Castro-Cruz both supplied

14  him with cocaine in September and October of 2014.

15          Documentary evidence also demonstrated that he was

16  involved in the money laundering portion of this drug

17  trafficking organization scheme between June of 2012 and

18  March 2014.

19          For these reasons the Court rejects Defendant

20  Castro-Cruz's contention that his involvement in the conspiracy

21  ended when he was arrested on August 23rd, 2013 and was

22  deported on September 26, 2013.

23          So, Mr. Stanton, unless you have evidence

24  demonstrating that Mr. Castro-Cruz actually withdrew from the

25  conspiracy other than his arrest and deportation or that he

1    somehow terminated his involvement in this conspiracy, I am

2    inclined to find that he was a conspirator for the entire time

3    that is involved here.

4         MR. STANTON:  Well, Judge, I would like to point out

5    the discovery is peppered with the government's own assertion

6    that Mr. Castro-Cruz was relieved of his responsibilities.

7         THE COURT:  No.  They were just transferred for the

8    time being and then he came right back.  So the fact that it's

9    transferred -- for him to withdraw, it has to be something more

10   than his just being arrested and deported.  He has to take

11   affirmative steps to withdraw himself from the conspiracy.  In

12   this case, he not only didn't do that; he came back on a

13   rotation months later.

14        MR. STANTON:  I don't agree with the government's

15   characterization on the rotation, and I will address that in a

16   second.  But, Judge, what you just said is correct, but what

17   you have to remember is he was arrested while he was on his way

18   home to Mexico.

19        THE COURT:  With drugs.

20        MR. STANTON:  No.  He had no drugs.  He had no drugs.

21   He was on his way home.  He had withdrawn.  He was on his way

22   home.  And that's when they arrested him because they had a

23   transponder, a tracker on his car, and that alerted them.  And

24   that's when they arrested him, a wall stop, if you will.  We

25   had a half-day or a whole-day hearing on that matter, as a

1    matter of fact, and so he had voluntarily withdrew himself from

2    that conspiracy.

3        And there is absolutely no evidence in the discovery

4    where he said I am coming back. There is no one saying, oh, he

5    is coming back. The government wants to say because his ID or

6    the IDs were found at the Cypress Street address, which they

7    have no evidence that he was ever there. They have pole

8    cameras at that residence and no photos of Mr. Castro-Cruz

9    appeared anywhere. That's part of the record. That's part of

10   the hearings as well. So there is no evidence, period, that he

11   was ever back in this country until September, October 2014, a

12   year later. You can't be held accountable when you are going

13   home.

14       Now, whether he comes back to the United States is not

15   the issue because he had been coming back and forth to the

16   United States working in the pig farms, working in California,

17   North Carolina. So coming back to the United States is not

18   relevant. It's not the issue.

19       The issue is can they prove that besides him getting

20   caught there at Zuni, absent that fact, that he was coming back

21   to deal drugs. He came back because those were the only people

22   he knew. He was just house -- laying up there. Excuse me, I

23   retract that statement.

24       But there was no evidence before he came back that he

25   was supposed to be doing a rotation. That's theory. Nobody

1    can prove that.  None of the defendants or co-defendants have

2    said that.  And Mr. Castro-Cruz -- nobody has testified that,

3    oh, I'll be back in a month.  I'll be back.

4         THE COURT:  Right, but it's not the government's

5    responsibility to prove that.  It's your responsibility.

6         MR. STANTON:  That's what I am trying to do, and maybe

7    not to your satisfaction, but the point is that what the Court

8    had said earlier was that he had withdrawn.  So that's --

9         THE COURT:  No, he has not withdrawn.

10         MR. STANTON:  Well, when he turned over the reins to

11    someone else, which the government has indicated that they are

12    aware of that, whether it's transfer, turned it over, they were

13    taken over.  He was going home when he got stopped.  He was

14    voluntarily on his way home.

15         Now, whether or not he spoke the words or he

16    understands the law well enough to say, I am withdrawing from

17    this conspiracy, but when you are leaving and going home and

18    leaving the country, what else is there?  What else is there?

19         He doesn't understand the legal nuance of he has to

20    say the words, I withdraw.  I will never be back.  The act

21    alone would have been sufficient and it wasn't because of the

22    intervention of the police.  They intervened him on his way

23    home after the decision to withdraw had been made.

24         THE COURT:  Mr. Giles?

25         MR. GILES:  Thank you, Your Honor.

1    I believe Mr. Till has brought to the Court's

2    attention that the scope of this conspiracy involves both a

3    local aspect and an international aspect in Mexico, and to move

4    this much narcotics requires coordination between both of those

5    aspects.

6        And in debriefings, they learned from other

7    co-defendants that this is how this organization functions.

8    There is a rotation.  There is a time period when you work

9    locally and there is a time period when you go back home to

10    continue the functioning of that organization.

11        That's exactly what this defendant did.  The fact that

12    he was on his way back home says nothing to communicate that he

13    was withdrawing from the conspiracy.  And, in fact, when we

14    look at his immigration record, he went back and forth across

15    the border numerous times.

16        So what the evidence shows is that he was doing

17    exactly what this conspiracy -- he was fulfilling the function

18    of the conspiracy as a whole to continue the function down in

19    Mexico, take some of the heat off from the time he was in

20    Denver and, sure enough, come back later.  And that's the cycle

21    that we see here.  So we believe that the Court's findings are

22    justified in the fact that he never withdrew or intended to

23    withdraw from this conspiracy.

24        *MR. STANTON:*  Brief response?

25        *THE COURT:*  You may.

1              MR. STANTON:  Judge, again, that's a great theory, but

2    there is absolutely no evidence that he participated in the

3    conspiracy, no wires from him, to him while he was in Mexico,

4    no phone calls from him.  After he left from the United States

5    and deported September 26, 2013, he had not had any more

6    contact, as far as we know, with this organization until he

7    came back.

8         And the government has not submitted any evidence of

9    that fact either while he was in Mexico or while he was in the

10   United States.  So you can't just say he was down there

11   functioning to do something when you don't have evidence that

12   he did.  You can theorize it, it a great theory, but it's not

13   supported by the evidence.

14        THE COURT:  The problem, as I mentioned, though, is

15   it's not the government's burden to prove.  The burden of

16   establishing withdrawal from the conspiracy is on the

17   defendant.  That's *Smith v. United States*, 133 S.Ct. 714,

18   (2013), also *United States v. Sells*, 477 F.3d 1226, (10th Cir.,

19   2007).

20        Now, if Mr. Castro-Cruz had left and not come back and

21   gotten involved again, then he would have a stronger argument,

22   but he didn't.  He came back and he became involved with the

23   same group of people, the same drug trafficking organization

24   doing a little bit different work, but still involved with

25   them.

 1          There was no evidence submitted by the defendant that

 2   he actually did withdraw from the conspiracy.  And the fact

 3   that he came back and voluntarily took up with them in

 4   September or October of 2014 indicates that he did not withdraw

 5   from the conspiracy.

 6          He has to take affirmative action either by reporting

 7   to the authorities or by communicating his intentions to his

 8   co-conspirators that he was withdrawing.  He has to totally

 9   abandon the conspiracy and he didn't do that.  He came back and

10   he took it up again.

11          So the Court finds that the evidence is sufficient to

12   support a finding by a preponderance of the evidence that

13   Mr. Castro-Cruz was involved continuously in both the drug

14   distribution and the money laundering conspiracies from

15   April 2013 through his arrest in October of 2014.

16          Therefore, the Court finds that the evidence supports

17   a base offense level of 34 as asserted by the government.  The

18   objection is overruled.

19          Do you wish to make any further argument for the

20   record for appeal?

21          *MR. STANTON:*  No, Your Honor.  It would just be

22   redundant.  He turned over the reins.  He left.  That was his

23   act of withdrawal.  I do -- I did mention all of that in my

24   motions, my pleadings.  And for the record, I do stand on my

25   pleadings for the purposes of this hearing.

1        THE COURT:  All right.  Does the government wish to

2   put anything further on the record?

3        MR. GILES:  No, Your Honor.  Thank you.

4        THE COURT:  Objection No. 5, the defendant objects to

5   the application of a two-level enhancement pursuant to United

6   States Sentencing Guideline Section 2D1.1(b)(1) based on the

7   firearm that was found among four pistols recovered when the

8   9151 Cypress Drive property was searched on May 7, 2014.

9        The government has the initial burden of proving

10  possession of a weapon for this enhancement by a preponderance

11  of the evidence; in particular, the government's proof that a

12  temporal and spacial relationship existed between the weapon,

13  the drug trafficking activity and the defendant.  *United States*

14  *v. Pompey*, 264 F.3d 1176, (10th Cir., 2001).

15       The government argues that circumstantial evidence

16  links Mr. Castro-Cruz to 9151 Cypress Drive.  When 9151 Cypress

17  Drive was -- the search warrant on 9151 Cypress Drive was

18  executed, nobody was in the house.  There were approximately 54

19  latent fingerprints and five latent palm prints identified to

20  the defendant on documents from that seizure and from the

21  seizure at 5830 Zuni, Apartment 3B.

22       Investigators were not able to determine if the books

23  and ledgers were being maintained by the defendant,

24  Mr. Castro-Cruz, because he refused to provide a handwriting

25  exemplar as ordered by the Court.

1          In fact, this defendant has never complied with this

2     Court's orders to provide handwriting and voice exemplars.  And

3     as the government points out, he has been in contempt of court

4     for two years and 130 days since his refusal to comply back on

5     September 10th, 2015.

6          The government submits that the numerous latent

7     fingerprints discovered at both Cypress Drive and Zuni Street

8     show Mr. Castro-Cruz is connected to both locations.  And they

9     also found a fake identification for him at 9151 Cypress Drive.

10    It bore his picture with the name of another person, Rogelio

11    Martinez Escalante.  The government's argument is that he left

12    his fake identity at the Cypress Drive location with the intent

13    of retrieving it when he returned to the United States.

14         While this evidence is sufficient to tie

15    Mr. Castro-Cruz to both the drug trafficking and money

16    laundering conspiracies, the Court finds that it is not

17    sufficient to prove that he possessed the gun merely because

18    the gun had DNA on it that came from him.

19         There is no persuasive evidence that Mr. Castro-Cruz

20    ever had actual or constructive possession of any of the

21    firearms in this case.  At best all the DNA proves is that at

22    one time Mr. Castro-Cruz handled the Smith & Wesson handgun

23    found at the premises of 9151 Cypress Drive.  The Court

24    therefore sustains the objection and finds that the two-level

25    enhancement of United States Sentencing Guideline

1    Section 2D1.1(b)(1) for the possession of a firearm is not

2    appropriately assessed.

3        Mr. Stanton, do you wish to make any further comment

4    for the record?

5        *MR. STANTON:*  No, Your Honor.

6        *THE COURT:*  Mr. Giles, do you wish to make any further

7    statements for the record?

8        *MR. GILES:*  Your Honor, just one point to briefly

9    point out.  In a proffer with Centeno Velasquez, he did note

10    that the defendant at one point offered him a Glock handgun to

11    take back down for sale in Nicaragua, which underscores the

12    defendant's knowledge of and discussion of firearms and his

13    access to firearms in connection with the course of this

14    conspiracy.

15        *THE COURT:*  Objection No. 6, the defendant objects to

16    the application of a two-level enhancement pursuant to United

17    States Sentencing Guideline Section 2D1.1(b)(12) based on the

18    fact that the defendant maintained a premises for the purpose

19    of manufacturing or distributing a controlled substance.

20        The defendant's argument consists of only a few

21    sentences.  "There is no information in discovery which would

22    suggest that Mr. Marco-Cruz owned, leased, rented, or lived at

23    9151 Cypress.  In fact, he was in Mexico at the time."

24        There were at least four different stash houses

25    mentioned in the Fourth Superseding Indictment to which

1    Mr. Castro-Cruz's name was attached in the count.  There was

2    the Cypress Drive, Count 114, Zuni apartment, Count 161, and

3    then there were a couple of others.

4         The Court is assuming, however, that we are really

5    talking about Cypress Drive in this case -- I am sorry, Zuni.

6    I am getting all my defendants confused.  Application Note 7 to

7    2D1.1(b)(12) provides that, "Among the factors the Court should

8    consider in determining whether the defendant maintained the

9    premises are whether the defendant held a possessory interest

10   in, (e.g., owned or rented) the premises; and the extent to

11   which the defendant controlled access to, or activities at, the

12   premises."

13        It goes on to state, "Distributing a controlled

14   substance need not be the sole purpose for which the premises

15   was maintained, but must be one of the defendant's primary or

16   principal uses for the premises."  The Court should consider

17   how frequently the premises was used by the defendant for

18   distributing a controlled substance and how frequently the

19   premises was used by the defendant for lawful purposes.

20        Defendant was arrested at the Zuni Street apartment

21   and that is the stash house this Court is going to focus on for

22   purposes of this enhancement.  Based on a similar objection

23   made by a co-defendant, the Court is familiar with the facts

24   relating to the Zuni Street apartment.

25        The lease for the apartment was in the name of someone

1    other than Castro-Cruz, Javier Vega-Sanchez and Jose Luis

2    Pacheco-Perez.  There is no evidence that Mr. Castro-Cruz paid

3    any rent for that apartment.  However, when the officers

4    entered the apartment on October 14, 2014, Mr. Castro-Cruz and

5    two of his co-defendants were present in the apartment sleeping

6    on air mattresses.

7         The men who signed the lease were not present.

8    Apparently they had already left Denver in September.  The

9    defendant lived in the premises during September and October of

10   2014.  Mr. Castro-Cruz used the apartment as his primary

11   residence coming and going as he wished during the months of

12   September and October of 2014, and he was fully aware that the

13   apartment was a stash house.

14        This enhancement has been applied by other courts

15   where the defendant has free access to the house, *U.S. v.*

16   *Garcia*, 774 F.3d 472, (8th Cir., 2014), *U.S. v. Jones*, 778 F.3d

17   375, (1st Cir., 2015).

18        The Court finds that the defendant's role in this drug

19   trafficking organization and his use of the apartment is a

20   sufficient basis to demonstrate that he maintained the premises

21   for the purposes of distributing and controlling --

22   distributing, rather, a controlled substance.  And therefore,

23   the objection is overruled and the two-level enhancement of

24   United States Sentencing Guideline section 2D1.1(b)(12) is

25   appropriately applied.

1          Mr. Stanton, I will allow you to make any --

2          MR. STANTON:  I have no argument, Your Honor.  I stand

3   on my record.

4          THE COURT:  Mr. Giles, any further statements?

5          MR. GILES:  I would likewise stand on the record, Your

6   Honor.

7          THE COURT:  The next objection is to the application

8   of a four-level enhancement pursuant to United States

9   Sentencing Guideline Section 3B1.1(a) for the defendant being

10  an organizer or leader of a criminal activity that involved

11  five or more participants or was otherwise extensive.

12          In his objection, defendant argues that there does not

13  appear to be information that suggests Mr. Castro-Cruz

14  recruited accomplices, was responsible for the planning and

15  organizing of the conspiracy, claimed a larger share of the

16  fruits of the crime or controlled others in the conspiracy.

17          United States Sentencing Guideline Section 3B1.1(a)

18  provides that if the defendant is an organizer or leader of

19  criminal activity that involved five or more participants or

20  was otherwise extensive, increase the offense level by four

21  levels.  Application Note 2 to this section makes it clear that

22  this enhancement applies to anyone who was an organizer,

23  leader, manager or supervisor of one or more other participants

24  so long as the activity itself involved five or more

25  participants.

1          In this case, there were more than 20 co-defendant

2    participants involved in the conspiracy.  The government's

3    evidence shows that Mr. Castro-Cruz was intercepted thousands

4    of times in the approximately 20 wiretaps authorized during

5    this investigation.  He was intercepted coordinating runners

6    and street-level dealers who needed to meet the runners to

7    obtain their drug inventory.

8          The calls range from Mr. Castro-Cruz telling the

9    street-level dealer to "open the door" to setting terms of

10   payment and prices, promising runners will deliver at a

11   specific time at a particular location, settling quality

12   control issues when purchasers complained about the quality of

13   the product, and agreeing to exchange poor quality drugs for

14   better quality drugs.

15         Mr. Castro-Cruz changed phones about every two weeks.

16   However, the government indicates that during a period of time

17   that it refers to as "sustained usage period," which is the

18   time period when most of the call activity over one particular

19   phone took place, that's phone one, between May 13, 2013 and

20   June 6, 2013, Mr. Castro-Cruz made an average of 55 calls per

21   day to coordinate runners and street-level dealers according to

22   the circumstances on the street.

23         Thus, the threshold of one or more of the participants

24   in a conspiracy of five or more participants is clearly met.

25   The Court finds that the application of a four-level

1    enhancement pursuant to United States Sentencing Guideline

2    Section 3B1.1(a) is appropriate and the objection is overruled.

3            Mr. Stanton, do you wish to make any further argument

4    for the record?

5            MR. STANTON:  I understand the Court's ruling.  I

6    guess my objection at this point would be that it would only be

7    appropriate to do a two-level enhancement pursuant to the

8    bargained for Plea Agreement, Judge.

9            THE COURT:  Well, the Plea Agreement is whether I give

10   you the sentence you asked for or not that I find all of it.

11   My job is to compute the guideline sentence as accurately as I

12   can, and so I would not be bound by, I don't think, that aspect

13   of your Plea Agreement.

14           Mr. Giles, does the government have anything further?

15           MR. GILES:  I will stand on the established record,

16   Your Honor.

17           THE COURT:  All right.

18           One thing, an aside that I need to address there, is

19   the defendant did not object to a two-level enhancement under

20   2D1.1B(15)(E), an aggravated role enhancement, and that he

21   committed the offense as part of a pattern of criminal conduct

22   engaged in his livelihood.  But in Document 2037, your

23   sentencing statement, he did raise that objection, so I need to

24   address that as well.

25           MR. STANTON:  Yes, that's correct, Your Honor.

1        THE COURT:  It seemed to me that that enhancement also

2    could have and should have been imposed on a few of the other

3    co-defendants and it was not.  So my concern is that the

4    application of that against Mr. Castro-Cruz is going to result

5    in a disparity in sentencing in terms of calculating the

6    guideline.

7        In addition, as far as I am concerned, it's all

8    academic since if I accept the Plea Agreement and sentence him

9    to the range agreed to by the parties I am going to vary much

10   below the sentence anyway.

11       So Mr. Giles, I guess I will ask do you have any

12   further evidence to submit with respect to that enhancement?

13   If you don't, then I am going to sustain that objection to that

14   application of the enhancement.

15       MR. GILES:  In light of the Court's statements this

16   morning, Your Honor, we will submit on the record.

17       THE COURT:  So I am going to sustain the objection to

18   that enhancement, so I have taken now four points off, I

19   believe.

20       MR. STANTON:  Thank you, Your Honor.

21       THE COURT:  Objection No. 8, the defendant objects to

22   the criminal history category as being an over-representation,

23   but he indicates that he is going to address that in his motion

24   for a downward departure in 2037, so I don't take that as an

25   objection I need to deal with at this point in the hearing.  I

1    will address that when we get to the actual analysis of the

2    sentence to impose.

3            All right.  Mr. Stanton, I believe that covers all the

4    objections that actually impact the calculation of the

5    guideline sentence that you set forth in 14-CR-144.  I also

6    believe that that covers all the objections that you set forth

7    in 17-CR-334 because there was an overlap on that.  Do you

8    agree?

9            *MR. STANTON:*  That is correct, Your Honor.  The

10   enhancements were pretty much identical.

11           *THE COURT:*  So objection No. 4 in 17-CR-334, the

12   two-level enhancement for firearms, that same ruling applies

13   there.  I have sustained that objection.

14           The two-level enhancement for maintaining the premises

15   for purposes of manufacturing, I have already overruled that.

16   My rulings in 14-144 to the extent that they are raised or

17   assessed, the objections raised to enhancements in 14-CR-144

18   also apply to 17-CR-334.

19           Are there any objections that you would like to

20   make -- additional objections you would like to make at this

21   time?

22           *MR. STANTON:*  No, Your Honor, I don't believe so.  May

23   I confer with counsel?

24           *THE COURT:*  You may.

25           *MR. STANTON:*  No, Your Honor.  Thank you.

1          THE COURT:  All right.  Mr. Giles, does the government

2     wish to make any additional objections at this time?

3          MR. GILES:  No, Your Honor.  Thank you.

4          THE COURT:  Now, does government wish to do anything

5     further with respect to my ruling on the Arizona conviction and

6     whether it's considered as an enhancement under 851?  Is there

7     anything further the government wishes to put on the record

8     with respect to that?

9          MR. GILES:  Your Honor, the government simply

10    preserves the argument, but in light of the Court's statements,

11    I don't believe we have any further argument or evidence to

12    present.

13         THE COURT:  Therefore, in this case, in Criminal Case

14    14-CR-144-CMA-4, the total offense level I think I calculated

15    correctly is 40 or is it 38?

16         PROBATION OFFICER:  38, Your Honor.

17         MR. STANTON:  38, Your Honor, minus two.

18         THE COURT:  All right.  So I need to change that here,

19    then.  What is the advisory guideline?  38, Criminal History

20    Category II, 262 to 327.

21         PROBATION OFFICER:  That's correct, Your Honor.

22         MR. STANTON:  Your Honor, there was no adjustment for

23    acceptance of responsibility.

24         PROBATION OFFICER:  I included minus two with that.

25         THE COURT:  You didn't get the three, but you got the

1   two.

2          *MR. GILES:*  I am sorry, Your Honor.  I may have

3   misheard.  So 37 --

4          *THE COURT:*  I thought he was a two.

5          *MR. STANTON:*  He is a two.

6          *MR. GILES:*  37.

7          *THE COURT:*  262 to 327.

8          *MR. STANTON:*  That's what I have.

9          *MR. GILES:*  Correct.

10         *THE COURT:*  All right.  So does the fine change at

11   all?

12         *PROBATION OFFICER:*  Your Honor, we need to use the

13   older handbook for that, so let me look.  I believe it does

14   not.

15         *THE COURT:*  I will let you look at that and I will go

16   ahead and make some other findings.

17         So the total offense level is now 38.  The defendant's

18   Criminal History Category is a II.  That results in an advisory

19   guideline range of 262 to 327 months on Count 1.  There is a

20   statutory mandatory minimum of 120 months on that count now

21   reduced from 240.  The statutory -- I am sorry, the supervised

22   release range is 10 years to life on Count 1 and one to three

23   years on Count 1 of the Information.

24         In Criminal Case No. 17-CR-334, I believe it's a 42

25   now.

1          *PROBATION OFFICER:*  That's correct, Your Honor.

2          *THE COURT:*  Do you agree with that, Mr. Stanton?

3          *MR. STANTON:*  Yes, Your Honor.

4          *THE COURT:*  Mr. Giles, do you agree with that?

5          *MR. GILES:*  Yes, Your Honor.

6          *THE COURT:*  The total offense level is a 42 and the

7    defendant's Criminal History Category is a II.  That results in

8    an advisory guideline range of 360 months to life.  Do you all

9    agree with that?

10          *MR. GILES:*  Yes, Your Honor.

11          *MR. STANTON:*  Yes, Your Honor.

12          *THE COURT:*  And that one carries a statutory mandatory

13    minimum sentence, however, of 240 months.

14          The fine is still $10 million on Count 1; is that

15    correct?

16          *PROBATION OFFICER:*  Yes, Your Honor, of the 14-CR?

17          *THE COURT:*  Yes.

18          *PROBATION OFFICER:*  That's correct.  It starts at

19    25,000.

20          *THE COURT:*  All right.  And the fine -- okay.  So both

21    of them have a fine of $25,000 to $1 million?  No, 334, 17-334

22    has 25,000 to $1 million.

23          *PROBATION OFFICER:*  That's correct, Your Honor.

24          *THE COURT:*  14-144 has a fine of $10 million on

25    Count 1.

1      *PROBATION OFFICER:*  I have 20 million here and I'm not

2  sure that's affected by the 851.  I would have to look.

3      *THE COURT:*  I see.  It says 25 to 20 million, 25,000

4  to 20 million.  It's all academic anyway because I am not going

5  to impose a fine, so ...

6      *PROBATION OFFICER:*  I can save time, Your Honor, and I

7  will keep looking.

8      *THE COURT:*  All right.

9      So right now my calculation is that the fine in 14-144

10 is 25,000 to $10 million.  The fine in 17-CR-334 is 25,000 to

11 $1 million.  And if that changes, I will be notified.

12     Defendant has filed both Documents No. 2037 and 2090

13 in 14-CR-144.  In those documents, the defendant argues for a

14 non-guideline sentence of 120 months in order to satisfy the

15 sentencing objectives set forth in 18, United States Code,

16 Section 3553(a).

17     In filing that motion, he compared himself to

18 Mr. Espinoza-Romero, who received a sentence of 144 months.

19 However, there are significant differences between

20 Mr. Espinoza-Romero and Mr. Castro-Cruz.

21     First, Mr. Espinoza-Romero's advisory guideline range

22 was significantly lower than Mr. Castro-Cruz's, only 188 to 235

23 months.  Mr. Espinoza-Romero had no previous criminal history

24 in the United States.  Unlike Mr. Castro-Cruz, Mr. Espinoza was

25 involved in the conspiracy in the United States only for a

1    short period of time.  And there was no evidence about whether

2    he had a role in the conspiracy before he got to Colorado.

3         The evidence against Mr. Espinoza-Romero supported

4    only a two-level enhancement for a manager pursuant to United

5    States Sentencing Guideline Section 3B1.1(c) as opposed to a

6    four-level organizer or leader enhancement which applies to

7    Mr. Castro-Cruz based on the evidence.

8         Finally, the government, whom this Court has to assume

9    knows more about the role of the defendants in these

10   conspiracies, agreed to an 11(c)(1)(C) Plea Agreement with

11   Mr. Espinoza-Romero of 120 to 168 months.  The Court sentenced

12   Mr. Espinoza to a term of 144 months, which was in the middle

13   of that range.

14        Mr. Castro-Cruz appears before this Court at age 38

15   having pled guilty to conspiracy to distribute drugs and money

16   laundering and to distribution of illegal drugs resulting in

17   death in 17-CR-334.  I have already covered in great detail

18   both the conspiracy and the defendant's role in the conspiracy

19   in my ruling on the objections.  I am not going to repeat those

20   statements at this point or findings at this point.

21        Mr. Castro-Cruz has a prior drug-related offense,

22   which I have covered in detail in the order that I issued, on

23   the Arizona charge, and he has traffic charges.  He dropped out

24   of school at a young age.  He claims that while he was in the

25   United States, he worked in the fields, worked in a

1   slaughterhouse and a pig farm somewhere in the Carolinas,

2   picked tomatoes in California, did painting, carpentry, mowing

3   of lawns and assisted a mechanic.  However, none of this

4   employment could be verified because defendant was unable to

5   identify any of his prior employers.

6          During the one month that he was in the United States

7   prior to his arrest in October of 2014, Mr. Castro-Cruz was

8   unemployed other than the work he did selling drugs.  He

9   refused to give his fingerprints and a voice exemplar which

10  hindered the government's ability to do comparisons in this

11  case, but other than his DNA on the gun at Cypress Street,

12  there is nothing in his background that indicates he is a

13  violent person or that he used firearms in connection with his

14  drug dealing.  However, the Court notes that he was the person

15  who sold the illegal drugs that resulted in at least one

16  person's death in Wyoming.

17         Mr. Castro-Cruz asserts that he has never been

18  sentenced to prison, and the only custodial sentence he has

19  ever received was the six-month sentence handed down after the

20  offense conduct in Arizona that occurred in 2000.

21         Based on my review of this case and after

22  consideration of the 3553(a) factors, I am inclined to accept

23  the Plea Agreement and sentence the defendant within the agreed

24  upon range.  I don't see any basis for a variant sentence.  I

25  have not yet determined, though, the number of months of

1    imprisonment that would be sufficient, but not greater than

2    necessary, to achieve the objectives of sentencing.

3           That being said, Mr. Stanton, I will hear from you.

4    Then I will hear from Mr. Giles.  And finally, Mr. Castro-Cruz,

5    if you wish to make a statement to me on your own behalf, I

6    will hear from you.

7           MR. STANTON:  Thank you, Your Honor.

8           First off, Your Honor, I understand my pleadings were

9    a little verbose and a little long.  And the reason I do that

10   is so the Court can have an idea of the way I am thinking about

11   this case.

12          THE COURT:  And I appreciate that very much.  I don't

13   think they were verbose or overly long.  I thought you were

14   very clear, and I very much appreciated it, especially when I

15   have a complicated sentencing like this where I have to spend

16   hours going through everything, so I appreciate all the detail

17   you gave me.  So don't apologize.

18          MR. STANTON:  Thank you, Your Honor.  Then I will

19   follow up with so I don't have anything to add to my pleadings.

20   I am going to stand on my pleadings.  I think I tried to put

21   everything in there to give you an opportunity to think about

22   where you are going to go with it since I am not going to vary

23   from what I have already indicated.  I know you have already

24   kind of decided that.

25          What I am -- the reason I did it the way I did it,

1    though, Judge, is so the Court can entertain the bottom of the

2    plea, the agreed upon plea.  When I am asking for an

3    over-representation of his criminal history, clearly I

4    understand the concept of the criminal history points two.

5         I have seen 13 points, so I am using that to give the

6    Court more mitigating factors to give a sentence of 20 years

7    because in the big scheme of things, on one case I think the

8    10-year sentence is more than adequate.  However, I understand

9    that based on the Court's ruling and Mr. Espinoza, he is in a

10   different situation than that.  So I've advised my client there

11   is no way to anticipate a ruling that you would get the same

12   sentence in that case as Mr. Espinoza because of the

13   culpability.

14        So we are not anticipating that.  However, I feel

15   compelled to make the argument to the Court because no longer

16   do we have the enhancement factor there.  So that's my

17   argument.  Realistically I think the Court should entertain a

18   sentence in that case between 10 and 23.  Now, ironically

19   that's what my client was trying to negotiate with this case at

20   the beginning, but we could not get to that point.

21        What we did -- and we are here now and we are asking

22   the Court to impose a sentence commensurate with his

23   culpability in this case.  I understand that we are going to

24   have the second case, which to me is all part and parcel,

25   Judge.  I think that's another mitigating factor, that this

1   case should have been all joined under Rule 8 in Colorado. He

2   would have been facing one sentence. We would not be

3   entertaining -- although it still would have been the 20-year

4   mandatory minimum, but we wouldn't have been entertaining going

5   to Wyoming dealing with that issue.

6          He was faced in a situation, Judge, in this case, in

7   these two cases, where he had to risk being sentenced here and

8   then having that sentence being used against him in Arizona and

9   just getting doubly punished. So I think that's part of the

10  reason that when we looked at the big factors of this case and

11  we looked at the guidelines and how tremendous -- how expansive

12  they were, a Plea Agreement was the appropriate way.

13         As you remember, we resolved this case right before

14  trial. We were on the eve of picking a jury in this case,

15  Judge, so it's not like a lot of work didn't go into it. I

16  mean, I would like to say Ms. Skalla and me put a lot of work

17  into it. And I commend them on their coming to the agreement,

18  but the point is I don't think even 23 years would be

19  appropriate.

20         I think the 20-year -- all this argument is -- I don't

21  want to use this lightly, but it's much to do about nothing

22  because we are looking at 20 to 23 years. And if the Court

23  accepts that, that's the range we are looking at, so my

24  argument is to swing the range from the 23 down to the 20.

25         And I think all the factors that I have included in

1    this, even though it may have seemed like I was trying to get

2    some outrageous sentence, I was trying to just make sure that

3    the Court felt as though a 240-month sentence based on this

4    case, which should have been a singular case, one case, would

5    be sufficient, but not greater than necessary, to achieve the

6    purposes of sentencing.

7         And I do believe that, Judge. So 20 years, it's a lot

8    of years no matter how you splice it. It's just a lot. And

9    the three years doesn't do anything. At some point it's

10   diminishing returns. After 10 years he would be

11   institutionalized and he would just be there. We know that.

12        So if we are really trying to achieve the sentencing

13   goals of 3553, Judge, the mandatory minimum sentence in one

14   case or somewhere in between the 10 and 20 years in that case.

15   And I'll let my co-counsel address the 334 case because that's

16   why he is here. I don't want to talk too much about it, but he

17   drove from Wyoming, so I think he should have some time to

18   speak on that, Judge.

19        THE COURT: All right. That's fine.

20        MR. BARRETT: Thank you, Your Honor.

21        I know a lot of what I am going to say is just

22   parroting Mr. Stanton and it's already on file in the record as

23   well, but, you know, when I was thinking about when I read the

24   Presentence Investigation Report and saw the disparity between

25   the recommendation and the 11(c)(1)(C), I didn't have any

1    hesitation to think that the 11(c)(1)(C) was an appropriate

2    range.  And as well, I didn't think it was inappropriate to

3    comply with the purposes of 3553 either to put him at 20 years.

4         And really, Your Honor, for the same reason that

5    Mr. Stanton just mentioned, I'll just echo.  The issue here is

6    Marco, basically, Mr. Castro-Cruz had the decision to make to

7    proceed to one trial and take your chances there.  It always is

8    a chance with any defendant.  It's always a tough decision.

9    They have either got to swallow one of the two pills, pick the

10   lesser of the two evils, really, which is you want to take your

11   chance with a trial and potential additional time with a

12   penalty or do you want to plead guilty and try to mitigate.

13        Mr. Castro-Cruz made the correct decision in this

14   circumstance with regards to the Wyoming conduct and the

15   Colorado conduct, which I agree should have been one case.

16   Nobody, nobody to date and nobody will, I don't anticipate at

17   all, will argue that this was not a common course and

18   conspiracy.

19        What happened was in Wyoming they got the April 2013

20   month and just kept him in Wyoming with that.  Of course, the

21   problem with that is he comes to Colorado and he is convicted.

22   With or without the Arizona prior conviction, it doesn't

23   matter.  He comes to Colorado.  He is convicted in Colorado.

24   There appears to be substantial evidence against him.  He is

25   then headed to Wyoming with a prior felony drug conviction,

1    which will count against him and which can be used as leverage

2    against him.

3              So what happens is, you know, he is going to have the

4    851 dangling over his head.  And basically defense counsel and

5    the defendant -- your leverage is really compromised at that

6    point.  In his case, had he been convicted of a felony again in

7    Wyoming, mandatory life dangled over his head.

8              Even if you flip the script, so to speak, and he goes

9    to Wyoming first, if he is convicted there, he has got 20.  And

10   he is coming down to Colorado.  Now he is going to be facing a

11   minimum mandatory of 20 in Colorado as well.  The only way he

12   really got any kind of benefit of the bargain of the case being

13   combined, quite frankly, is through a consent to transfer with

14   a guilty plea is really the only way he could effect that.

15   That was the appropriate decision by Mr. Castro-Cruz.

16             But when you are looking at the 20 to 23 -- I remember

17   speaking with Boston.  The Wyoming discovery just by itself is

18   much thinner than the Colorado case.  It's tough.

19   Mr. Boston -- Mr. Stanton does a great job.  And I feel bad

20   telling him, listen, when it comes to sentencing with these

21   characteristics enhancements, specific offense characteristic

22   enhancements, that has already been addressed, none of that is

23   in the Wyoming case and it's because it's just that one month.

24   And so Boston carried the day really with regard to the

25   sentencing hearing.  He did a good job.

1          So, Your Honor, I just concur with Mr. Stanton, of

2    course, on behalf of Mr. Cruz that because of what I just

3    mentioned and in addition he is also saving the Court in

4    Wyoming the expense of a trial and everything associated,

5    expenses and time associated with that, quite frankly.  I think

6    that needs to be taken into account because had he come to

7    Colorado, had he been convicted, headed down to Wyoming, had

8    have an 851 then filed, he has to go to trial, really, for all

9    practical intents and purposes.

10          So, Your Honor, for those reasons I advise the Court

11    strongly that a 20-year sentence is certainly sufficient under

12    18 U.S.C. 3553.

13          THE COURT:  Thank you.

14          Mr. Giles?  Why doesn't the defendant go ahead and

15    take a seat and we will let Mr. Giles go ahead and use the

16    podium.

17          MR. GILES:  Thank you, Your Honor.

18          Your Honor, I have somewhat the awkward position of

19    coming into this at the end after Mr. Till and Ms. Skalla put

20    so much work into this and try to summarize why this case meant

21    so much to them.  And I know they have gone to great lengths to

22    summarize the local conduct, the extent of the organization,

23    and the Court has heard the James hearings.  And all that is

24    important because it's a backdrop to how serious this is.

25          We are facing an incredible opioid epidemic at this

1    point, and the defendant is part of that reason.  He, despite

2    having a prior felony drug conviction, continues to engage in a

3    very large scale conspiracy to bring this poison into the

4    United States and really to hold all the people who were

5    subject to this terrible addiction in the same kind of contempt

6    that he holds this Court by refusing to comply with these

7    orders.

8         He simply does not seem to conceptualize the impact

9    that this has on those around him while he is working to make

10   money.  And the one name that hasn't been mentioned in any of

11   this this morning is Kaleb Paul Skog.  And I would like to

12   address him because there are probably many others like him in

13   relation to this case.  It just so happens that we know one.

14        And Kaleb Paul Skog was an incredible student at the

15   University of Wyoming.  He came from an incredible family.  His

16   father is an attorney up in Evanston, Wyoming, who is both a

17   prosecutor in a small municipality and also a defense attorney.

18        And Kaleb had some health issues that unfortunately

19   led him down a path we see all the time with the opioids being

20   prescribed to him and his pain continued to get worse.  He

21   wanted so badly to finish as a straight A student at the

22   University of Wyoming in the philosophy section where they now

23   have a scholarship named after him.

24        And as part of what he gave up to achieve that was his

25   health because he had cystic fibrosis.  And as he worked so

1    hard, he did not spend the kind of time that he needed to on

2    maintaining his health.  So his need for the opioids to manage

3    that pain and that the disease process increased.  And then

4    finally when the pill supply cut off, it was the defendant who

5    was there, the defendant who was there for Mr. Adams,

6    Mr. Skog's roommate to come up to sometimes twice a day from

7    Wyoming to Denver to pick up from Nico Centeno Velasquez.

8         *THE COURT:*  You mean twice a week?

9         *MR. GILES:*  No, Your Honor.

10         *THE COURT:*  Twice a day?

11         *MR. GILES:*  Yes, Your Honor.  Such is the addiction.

12    And they would pick up from Nico Centeno Velasquez, who

13    received heroin from this man, and would take it back to

14    Evanston, Wyoming.  And one day the Skog family got the call

15    that their son had passed away.  And the Skog family grieves

16    every day from this.  I have had many conversations with

17    Mr. Skog.  It is such a neat family because Kyle Adams was the

18    son of a state trooper up there and it just shows anybody can

19    give in to opium addiction.  It's such a powerful tenacious

20    drug.

21         And Kyle Adams is the one who directly handed that

22    dose that killed Kaleb Paul Skog to him and found him, in fact,

23    the next day.  And the Skog family reached out to Kyle Adams,

24    visits him and tries to make sure they are doing everything

25    they can for him so when he gets out, he will have a path.  And

1    it looks like Mr. Adams actually being prosecuted on this case

2    in Wyoming probably saved his life because it helped him turn

3    around, and he would tell you that.  And he is doing much

4    better, but no small part to the type of family the Skogs are

5    and how they've reached out.

6          But understandably, this has been a long road.  And I

7    bring that up because I don't think that we ought to miss when

8    we look at the quantity of heroin involved in this case, what

9    this man is dealing with, the scope of this operation, the

10   rotation, how sophisticated it is to avoid detection.  It is an

11   incredible lift.  The Court mentioned the number of wiretaps

12   that it takes to disrupt and dismantle this type of operation.

13   And you take that whole mechanism of which defendant is an

14   organizer or leader and you take one small bag of what he

15   distributed on one day, and you see the devastating results it

16   has for a lifetime of this entire family.  And we have no idea

17   how many other families this had the effect on.

18         So what's the difference between 20 and 23 years?  In

19   some ways it may be academic, as defense counsel suggested, but

20   I would suggest quite to the contrary.  There was a lot of

21   wrangling on this case, and I don't think so much at the end of

22   the day one to two cases is the issue we ought to be

23   discussing.  Rather, it's do we recognize the scope of what

24   this man is doing for his own self-interests and then the fact

25   that all he wants to do once he is apprehended is to disobey

1    the Court's orders and to file these last-minute motions.

2         I just don't see any sort of acceptance that leads us

3    down the road to say if presented with the same opportunity, he

4    wouldn't be right back at it.  And that's what concerns me.

5    And that's why I am asking the Court to go with the top end of

6    the (c)(1)(C) agreement for the 23 years in this case, Your

7    Honor.

8         THE COURT:  Mr. Stanton, you and Mr. Castro-Cruz may

9    approach the podium.

10        Mr. Castro-Cruz, do you wish to make any statement to

11   me on your own behalf before I impose sentence?

12        THE DEFENDANT:  Yes.  I would like to apologize for

13   the harm that I caused.  I feel very badly about that.  I did

14   sell drugs, but it was just for a short time, I mean, and I

15   just didn't -- you know, to make a few bucks.  I just didn't

16   consider the consequences.  I mean, in Wyoming -- I mean, in

17   that Wyoming case, in Wyoming wasn't -- I didn't -- they say

18   that I am a person who sold those drugs to that guy, but I

19   didn't even know him.  But the attorney from Wyoming told me I

20   should plead guilty to make it a single case.  And I feel

21   really badly and I want to apologize.

22        THE COURT:  Okay.

23        THE DEFENDANT:  Thank you.

24        THE COURT:  As a result of the United States Supreme

25   Court's rulings in *United States v. Booker* and *United States v.*

1    *FanFan*, the United States Sentencing Guidelines have become

2    advisory to this Court.  Although this Court is not bound to

3    apply those guidelines it has consulted them in taking them

4    into account along with the sentencing factors set forth at 18,

5    United States Code, Section 3553(a).

6        The Court finds that the defendant's base offense

7    level is 34 pursuant to United States Sentencing Guideline

8    Section 2D1.1(a)(5) and (c)(3).  The Court finds that a

9    two-level enhancement because a firearm being possessed

10   pursuant to United States Sentencing Guideline

11   Section 2D1.1(b)(1) does not apply.

12       The two-level increase because defendant maintained a

13   premises for the purpose of manufacturing or distributing a

14   controlled substance pursuant to United States Sentencing

15   Guideline Section 2D1.1(b)(12) does apply.  The two-level

16   increase because the defendant played an aggravated role --

17   received an aggravated role enhancement and committed the

18   offense as part of a pattern of criminal conduct, which was

19   engaged in as a livelihood pursuant to United States Sentencing

20   Guideline Section 2D1.1(b)(15)(E) does not apply.  The

21   four-level increase for having an aggravated role pursuant to

22   United States Sentencing Guideline Section 3B1.1(a) does apply.

23       The Court determines that no finding is necessary

24   concerning the remaining controverted matters because they will

25   not be taken into account in imposing sentence nor will they

1    affect the sentence the Court imposes.

2        Neither the government nor the defendant has

3    challenged any other aspect of the Presentence Report.

4    Therefore, the remaining factual statements and guideline

5    applications are adopted without objection as the Court's

6    findings of fact concerning sentencing.

7        In Criminal Case 14-CR-144-CMA_4, the total offense

8    level is 38.  Defendant's criminal history category is II.

9    That results in an advisory guideline range of 262 to 327

10   months on Count 1 of the Fourth Superseding Indictment with a

11   statutory mandatory minimum of 120 months.  The statutory

12   maximum sentence for Count 1 of the Information is 240 months.

13   The supervised release range is 10 years to life on Count 1 of

14   the Superseding Indictment and one to three years on Count 1 of

15   the Information.  The fine is 25,000 to $10 million because the

16   851 enhancement does not apply.

17       In Criminal Case 17-CR-334 -- I am sorry, the

18   supervised release range has also been reduced to five years to

19   life on Count 1 because 851 is not applicable.

20       In Criminal Case 17-CR-334, the total offense level is

21   42.  Defendant's Criminal History Category is II.  That results

22   in an advisory guideline range of 360 months to life.  However,

23   there is a statutory mandatory minimum of 240.  The supervised

24   release range is 10 years to life and the fine is $25,000 to

25   $1 million.

1    For the reasons previously stated, the Court accepts

2    the Rule 11(c)(1)(C) Plea Agreement and will depart or vary

3    from the advisory guideline range as set forth in the Plea

4    Agreement.

5    In Criminal Case No. 14-CR-00144-CMA, pursuant to the

6    Sentencing Reform Act of 1984, it is the judgment of the Court

7    that the defendant, Marco Castro-Cruz, is hereby committed to

8    the custody of the Bureau of Prisons to be imprisoned for a

9    term of 240 months on Count 1 of the Fourth Superseding

10   Indictment and 240 months on Count 1 of the Information with

11   each count to run concurrent to one another and concurrent to

12   the sentence imposed in Criminal Case 17-CR-334.

13   I need to make a correction apparently to the

14   supervised release range in 17-CR-334.  It is actually three

15   years to five years instead of 10 years to life.

16   In Criminal Case No. 17-CR-334, pursuant to the

17   Sentencing Reform Act of 1984, it is the judgment of the Court

18   that the defendant, Marco Castro-Cruz, is hereby committed to

19   the custody of the Bureau of Prisons to be imprisoned for a

20   term of 240 months to run concurrently to the sentences imposed

21   in Case No. 14-CR-00144.

22   Upon release from imprisonment, the defendant shall be

23   placed on supervised release for a term of five years on

24   Count 1 of the Fourth Superseding Indictment and three years on

25   Count 1 of the Information to run concurrently to one another

1    and to the supervised release imposed in Criminal Case

2    17-CR-00334.

3              In 17-CR-00334, defendant shall be placed on

4    supervised release for a term of three years to run

5    concurrently with the terms imposed in 14-CR-00144.

6              Within 72 hours of release from the custody of the

7    Bureau of Prisons, the defendant shall report in person to the

8    probation office in the district to which he is released.

9              While on supervised release, he shall not commit

10   another federal, state or local crime; shall not possess a

11   firearm as defined in 18, United States Code, Section 921; and

12   shall comply with the standard conditions that have been

13   adopted by this Court in General Order 2016-1.

14             He shall not unlawfully possess a controlled

15   substance.  He shall refrain from any unlawful use of a

16   controlled substance.  He shall submit to one drug test within

17   15 days of release on supervised release and two periodic tests

18   thereafter.  He shall cooperate in the collection of DNA as

19   directed by the probation officer.

20             If he is deported, he shall not thereafter re-enter

21   the United States illegally.  If he re-enters the United States

22   legally, he shall report to the nearest United States Probation

23   Office within 72 hours of his return.

24             Pursuant to Rule 32. the of the Federal Rules of

25   Criminal Procedure and the defendant's admission to the

1    forfeiture allegations contained in the Indictment, the

2    defendant shall forfeit to the United States any and all

3    property, real or personal, derived from the proceeds from the

4    instant offenses.

5         Defendant shall pay a special assessment of $200 in

6    14-CR-144 and a special assessment of $100 in 17-CR-334, both

7    of which are ordered due and payable immediately.

8         The Court finds that the defendant does not have the

9    ability to pay a fine, so the Court will waive the fine in this

10   case.

11        Mr. Castro-Cruz, I just want you to understand that I

12   take my task of sentencing very seriously and it's the hardest

13   thing I have to do because I understand that I have your life,

14   and in this case a major portion of your life, in my hands.

15   And I want to be fair to you, but I also have an obligation to

16   the public and to society to protect them from further crimes,

17   to promote respect for the laws of the United States, to impose

18   a sentence that is a just punishment and one that's going to

19   deter you and others from committing other similar conduct.

20        Now, you were involved with a criminal organization

21   which was responsible for bringing in and distributing large

22   amounts of heroin and cocaine in the state of Colorado and

23   elsewhere, although that's not part of this case.  And this

24   Court considers the distribution of drugs to be a significant

25   threat to the public and to society and it is destroying the

1    fabric of the society here in Colorado and in the United

2    States.  It is ruining the lives of people who are addicted.

3    And you preyed on that addiction, that vulnerability for greed,

4    for money.

5            And you need to understand that after you've served

6    your sentence, it is likely you will be deported.  And I am

7    concerned because you have been deported previously and you

8    disregard the immigration laws and you come back.  And I am

9    giving you fair warning now that you now have some major felony

10   convictions on your record.  And if you come back to the United

11   States illegally, even if you do nothing else wrong and you are

12   caught, you are going to be spending a lot of time in prison

13   again.  Do you understand that?

14           *THE DEFENDANT:*  Yes.

15           *THE COURT:*  I do believe that a sentence of 240 months

16   imprisonment in both cases to run concurrently to one another

17   with the terms of supervised release that were imposed is a

18   sufficient, but not greater than necessary, sentence to achieve

19   the purposes of sentencing.

20           Mr. Castro-Cruz, although you waived your appellate

21   rights under the circumstances that are outlined in your Plea

22   Agreement, to the extent you have not waived your right to

23   appeal, you are advised if you desire to appeal, a notice of

24   appeal must be filed with the Clerk of the Court within 14 days

25   after entry of judgment or your right to appeal will be lost.

1   If you are not able to afford an attorney for an appeal, one

2   will be appointed to represent you.  And if you request, the

3   Clerk of the Court must immediately prepare and file a notice

4   of appeal on your behalf.

5           Mr. Giles, no motion to dismiss the remaining counts

6   in the Fourth Superseding Indictment as against Mr. Castro-Cruz

7   in 14-CR-144 was filed.  Do you wish to make an oral motion at

8   this time?

9           *MR. GILES:*  Thank you, Your Honor.  If the Court will

10  entertain the oral motion, I would move to dismiss the

11  remaining counts in that case.

12          *THE COURT:*  All right.  That oral motion is granted in

13  14-CR-144.  Government's motion Document No. 17 to dismiss

14  Count 2 in 17-CR-344 is granted.

15          Is there any other business to be brought to my

16  attention?

17          *MR. GILES:*  Not on behalf of the United States, Your

18  Honor.

19          *MR. STANTON:*  Your Honor, it's alluded to, and I don't

20  know how it turns out, that my client, he is entitled to 1208

21  days since October 14, 2014.  The fact that he is in contempt

22  is an unknown area for me.  And what I know is I anticipate the

23  Court's intent is that my client, Mr. Castro-Cruz, get a

24  20-year sentence with all the benefits associated with that.

25          If, in fact, that contempt does something and he --

1    where he wouldn't get that credit, I would like the Court to

2    address that because the contempt -- this is your contempt.

3    This is your relationship with him, not me, but he didn't take

4    you to trial.  He didn't go to trial, whereas the information

5    that you would have used against him became necessary.

6             So I am asking the Court to do whatever judicially you

7    can to assure that your intent, the 20-year sentence with the

8    intended benefits of credit for time served the time he has

9    been in there, that the Court make sure he gets that.

10    *THE COURT:*  I never have to deal with this because I

11    have never had a defendant who has been so adamant in refusing

12    to obey my orders.  So I would suggest that you file a written

13    motion.  I will take a look at the issue and I will decide

14    whether he gets any credit since he has been in contempt for,

15    what, two and a half years now?

16    *MR. STANTON:*  Well, I don't know that it is an issue.

17    It's just been alluded in pleadings.

18    *THE COURT:*  Well, if you are concerned with what

19    Bureau of Prisons is going to do or if the government wishes

20    for me to pursue the contempt order, I think you are probably

21    best off filing something to bring this to a head so we know

22    where we stand with it.

23    *MR. STANTON:*  I don't know that they will.  I guess if

24    they do, then I will address it.  I will confer with counsel

25    just to make sure.  I just thought I would bring it up so the

1    Court would know that that is an issue that's kind of just --

2            THE COURT:  And I have never had to deal with it

3    before.

4            MR. STANTON:  Neither have I, Judge.  Thank you.

5            THE COURT:  Mr. Giles, do you have any idea whether

6    the government intends to pursue anything further with respect

7    to contempt of my orders?

8            MR. GILES:  Your Honor, I believe Mr. Till does intend

9    on pursuing that.

10            THE COURT:  So I will give the government 30 days to

11    file something.

12            MR. GILES:  Thank you, Your Honor.

13            THE COURT:  Mr. Castro-Cruz, you look like you want to

14    make a statement.

15            THE DEFENDANT:  So that thing about the call, so, I

16    mean, I could make that call and also give my fingerprints.

17            THE COURT:  It's a little late at this point.

18            MR. STANTON:  Actually, Judge, Mr. Till I believe had

19    indicated he would still entertain that.  He is here, so he can

20    address it himself.

21            THE COURT:  Mr. Till?

22            MR. TILL:  Your Honor, we would like his handwriting

23    samples.  We think he wrote some of the documents so we could

24    identify the author of some of the records so we could use them

25    in any further proceeding, so I am interested in getting his

1    compliance.

2         THE COURT:  So if he complies with my orders to give

3    the exemplars you've asked for, then I will take that as good

4    faith on his part so that he would get credit.  And I won't

5    hold him in contempt to take away the credit for the time he

6    has served.

7         MR. STANTON:  And so I am clear, Mr. Till only seemed

8    interest in --

9         THE COURT:  I want him to give everything that I

10   ordered.

11        MR. TILL:  I want everything, but I am advising the

12   Court I think it will be most productive with respect to the

13   handwriting.

14        THE COURT:  So my understanding is both voice

15   examplars and handwriting exemplars.

16        MR. STANTON:  That's correct, and he is willing to

17   comply --

18        THE COURT:  If he willing to do that, then I am

19   willing to perhaps soften the stance I would have had on an

20   enforcement of contempt.

21        MR. STANTON:  Thank you, Your Honor.

22        THE COURT:  All right.

23        Thank you very much, Deputy United States Marshals,

24   for your assistance.

25        I hereby remand Mr. Castro-Cruz to the custody of the

 1    United States Marshal for the District of Colorado.  The Court

 2    will be in recess.

 3         (Recess at 10:35 a.m.)

 4                      REPORTER'S CERTIFICATE

 5        I certify that the foregoing is a correct transcript from

 6    the record of proceedings in the above-entitled matter.  Dated

 7    at Denver, Colorado, this 20th day of April, 2017.

 8

 9                            S/Janet M. Coppock

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25